IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNWIRED PLANET, INC.<br>(F/K/A OPENWAVE SYSTEMS, INC.),<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Civ. No. 14-967-SLR<br>)<br>)<br>)<br>) |

C. Barr Flinn, Esquire, Kathaleen S. McCormick, Esquire, and Pilar G. Kraman, Esquire of Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: R. Todd Cronan, Esquire and Stephanie M. Aronzon, Esquire of Goodwin Procter LLP, Boston, Massachusetts.

Francis DiGiovanni, Esquire, Todd C. Schiltz, Esquire, and Thatcher A. Rahmeier, Esquire of Drinker Biddle & Reath LLP, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: June 15, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I.    INTRODUCTION

This case presents a single focused issue of contract interpretation.  At issue is the construction of Section 5.1.3 of a patent license agreement (the "License Agreement") between plaintiff Unwired Planet, Inc. ("Unwired Planet") and defendant Microsoft Corp. ("Microsoft"), dated September 30, 2011.  In Section 5.1.3, Microsoft agreed to pay Unwired Planet $10 million upon notice that Unwired Planet had closed a "Qualifying Agreement," as that term is defined in the License Agreement.  Microsoft disputes whether an agreement between Unwired Planet and Lenovo PC International Limited ("Lenovo") satisfies the conditions of a "Qualifying Agreement" and, therefore, refuses to pay Unwired Planet the $10 million.

Currently before the court are cross-motions for summary judgment.  (D.I. 93, 94)  The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  For the reasons discussed below, Unwired Planet's motion for summary judgment is granted and Microsoft's motion for summary judgment is denied.

## II.    BACKGROUND

### A.    The Parties

Unwired Planet is a technology licensing company founded in 1994 as Libris, Inc., and then later re-named Openwave Systems, Inc. ("Openwave").  (D.I. 95 at 4)  It has developed technologies used in the mobile communications industry.  (*Id.*)  In 2012, Openwave completed its transition to a licensing revenue model and changed its name to Unwired Planet.  (*Id.*)  Microsoft is one of the world's largest technology companies.

(*Id.* at 5) It develops, licenses, and supports a wide range of software products, services, and devices. (*See* SEC Form 10-K dated June 30, 2015 at p. 3)

In December 2010, before Openwave became Unwired Planet, it sent a letter to Microsoft asserting that Microsoft infringed certain Openwave patents. (D.I. 95 at 5) To resolve the issue, Microsoft choose to negotiate for a patent license. On September 30, 2011, Openwave and Microsoft executed the License Agreement. (D.I. 100 at 12)

## B.    Relevant Contract Provisions

The License Agreement provides for a cross-license wherein Unwired Planet licensed the "Openwave Licensed Patents" to Microsoft, and Microsoft licensed fifteen of its patents to Unwired Planet. (*Id.* at 4) "Openwave Licensed Patents" is defined as all the patents and patent applications that Unwired Planet owned as of the effective date of the License Agreement (i.e., September 30, 2011). (*Id.*) Any patents Unwired Planet acquired or developed after the effective date are not included in the definition of "Openwave Licensed Patents." (D.I. 101, Ex. 1 § 1.8)

In exchange for the license of the Openwave Licensed Patents, Microsoft agreed to pay in cash $15 million. (*Id.* at § 5.1.1). Microsoft also agreed to pay $10 million if Unwired Planet later closed a "Qualifying Agreement" with an unaffiliated third-party. (*Id.* at § 5.1.3) Section 5.1.3 sets forth the promise of payment and conditions for a "Qualifying Agreement." Specifically, it states:

> **5.1.3 Qualifying Agreement License Fee**. If Openwave closes a Qualifying Agreement, Microsoft shall make a non-refundable payment of Ten Million US dollars ($10,000,000.00 US) within thirty (30) calendar days of the date on which Microsoft receives from Openwave written

2

notice (referencing this Section 5.1.2)[1] that Openwave has closed such a Qualifying Agreement.

> As used in this Section 5.1.[3], a **"Qualifying Agreement"** means a non-exclusive and non-sublicensable patent license with an unaffiliated operating company under the Openwave Licensed Patents (i) that is executed within three (3) years of the Effective Date, and (ii) for which Openwave receives a payment of at least Twenty-Five Million US dollars ($25,000,000.00 US).

> For the avoidance of doubt, (1) Microsoft will make no payment to Openwave under this Section 5.1.[3] if Openwave does not close a Qualifying Agreement, and (2) a Qualifying Agreement does not include any patent license with an entity, such as RPX Corporation, Intellectual Ventures or similar entities, that aquire [sic] patent rights for the purpose of granting releases, sublicenses, covenants or immunities from suit to third parties.

(*Id.* at § 5.1.3)

Section 5.1.3 contains several conditions for a "Qualifying Agreement" that are not in dispute. The undisputed conditions are: (i) Unwired Planet executes a non-exclusive, non-sublicensable patent license; (ii) the counter-party to the patent license is an unaffiliated operating company; (iii) the patent license is executed within 3 years of the effective date; and (iv) Unwired Planet receives a payment of at least $25 million dollars.

The parties dispute the purpose of the Qualifying Agreement provision. Microsoft claims the provision provided market validation of the purported value of the Openwave Licensed Patents. (D.I. 95 at 12) Unwired Planet claims that if market validation was Microsoft's intent, it was an unexpressed, subjective intent that Unwired Planet did not share. (*Id.*) Unwired Planet thought the Qualifying Agreement provision was an incentive to license the Openwave Licensed Patents to other parties, including Microsoft's competitors, so that Microsoft was not the only company having to pay this fee. (D.I. 104

---

[1]     The reference to "Section 5.1.2" is a typographical error in the final text of the License Agreement that should have read "Section 5.1.3." (D.I. 95 at 11 n. 3)

at 6; D.I. 115 at 54-55) The License Agreement itself is silent as to the purpose of the Qualifying Agreement provision.

Finally, the License Agreement contains an integration clause and choice of law clause. The integration clause states that the License Agreement "reflects the complete understanding of the parties regarding the subject of the Agreement, and supersedes all prior related negotiations." (D.I. 101, Ex. 1 § 13) The choice of law clause provides that federal law governs matters arising under federal subject matter jurisdiction and Delaware law governs all other matters. (*Id.* at § 11)

## C. Negotiating History

Although it is not relevant to construing an unambiguous contract, the parties provided some background on the negotiating history of the License Agreement. That history is recounted here for the sake of providing a full background of facts. From December 2010 through July 2011, the parties met and exchanged correspondence regarding a portfolio license. (D.I. 100 at 7) Then, between September 13, 2011 and September 30, 2011, the parties exchanged several drafts of the License Agreement. (D.I. 95 at 6-10)

In the first two drafts, Microsoft defined "Openwave Licensed Patents" to include both Unwired Planet's then-owned patents and any patents that Unwired Planet developed or acquired after the effective date of the License Agreement. (D.I. 100 at 9) Each time, Unwired Planet rejected that definition, and proposed language stating that only those patents that Unwired Planet owned as of the effective date of the License Agreement would be included in the definition of Openwave Licensed Patents. (*Id.*; D.I. 95 at 7)

4

On September 22, 2011, Microsoft circulated a third draft making clear that the definition of Openwave Licensed Patents did not include any patents acquired or developed after the effective date. (D.I. 95 at 7; D.I. 100 at 9)  However, Microsoft also proposed adding the following bolded equivalency and attribution language to the Qualifying Agreement Provision:

> As used in this Section 5.1.[3], a "Qualifying Agreement" means a non-Sublicensable, non-transferrable and non-exclusive patent license with a third party under the Openwave Licensed Patents (i) that is executed within three (3) years of the Effective Date, and (ii) **that is equivalent to the patent license (and provides rights no broader than those rights) received by Microsoft under this Agreement (and specifically, provides no Sublicense Right), and (iii)** for which Openwave receives a payment of at least Twenty-Five Million US dollars ($25,000,000.00 US) **that is attributable to the grant of the patent license under the Openwave Licensed Patents (and not attributable to a grant of license under any other patents or attributable to any other consideration provided by Openwave)**.

(D.I. 95 at 8-9)  This additional language makes clear that Microsoft would require either that: (1) any Qualifying Agreement be for exactly the same set of patents that Microsoft licensed (the "equivalency" requirement); or (2) some proof that $25 million was received solely for the Openwave Licensed Patents (the "attribution" requirement). (*Id.* at 9)

In response, Unwired Planet circulated a draft the next day striking out the equivalency and attribution requirements.  As Microsoft understood, Unwired Planet planned to acquire additional patents in the future and would license the legacy patents and any additional patents as one portfolio. (*Id.* at 24)  Microsoft's proposed equivalency and attribution requirements would compel Unwired Planet to maintain two separate portfolios, each with a different value, which Unwired Planet thought would be detrimental to its business model. (*Id.* at 9)

5

In a draft circulated on September 26, 2011, Microsoft inserted the language bolded below establishing a slightly revised equivalency requirement:

> As used in this Section 5.1.[3], a "Qualifying Agreement" means a non-exclusive and non-sublicensable patent license with a third party under the Openwave Licensed Patents (i) that is executed within three (3) years of the Effective Date, (ii) **that provides rights no broader than those received by Microsoft under Openwave Licensed Patents through this Agreement, and (iii)** for which Openwave receives a payment of at least Twenty-Five Million US dollars (\$25,000,000.00 US)[.]

(D.I. 95 at 10) (emphasis added)

After a call between the parties, Microsoft circulated a fourth draft on September 27, 2011 "to address several of the concerns that Openwave raised during the call." (*Id.*) In this draft, Microsoft omitted the equivalency requirement. (*Id.*) No previously inserted equivalency or attribution language, nor any similar language, appeared in the final agreement. (*Id.*)

### D. The Lenovo Agreement

After Unwired Planet executed the License Agreement with Microsoft, it added a large number of patents to its portfolio. (D.I. 100 at 12) In March 2014, Unwired Planet executed an agreement with Lenovo (the "Lenovo Agreement"), whereby Lenovo purchased some patents from Unwired Planet and licensed others. (D.I. 95 at 12) The license portion of the Lenovo Agreement included all of the same patents licensed to Microsoft as well as additional patents. (*Id.* at 12-13) Lenovo paid Unwired Planet somewhere between \$40 million and \$60 million for the license. (D.I. 95 at 13; D.I. 100 at 12) The Lenovo Agreement does not allocate the consideration between the legacy patents and the additional patents in the license, and Unwired Planet did not undertake any valuation when it negotiated and executed the Lenovo Agreement. (D.I. 104 at 8)

6

On April 17, 2014, Unwired Planet provided Microsoft with timely, written notice that it had closed a Qualifying Agreement. (D.I. 95 at 13) On April 21, 2014, Microsoft acknowledged receiving the notice but refused to pay the $10 million unless Unwired Planet provided an attribution of the proceeds showing that Lenovo paid at least $25 million for the Openwave Licensed Patents. (*Id.*) Unwired Planet responded that Microsoft's demand was not based on any rights provided in the License Agreement. (*Id.*)

When the parties were unable to resolve their differences, despite good faith efforts, Unwired Planet brought suit on July 22, 2014. (*Id.*) On July 29, 2015, the parties entered into a Stipulation and Order whereby Unwired Planet acknowledged that, although it received more than $25 million for the license portion of the Lenovo Agreement, "it did not receive at least $25 million as consideration allocated or allocable solely for a license to the Openwave Licensed Patents under the terms of, or as a result of entering, the Lenovo Agreement." (D.I. 70 ¶ 6) Unwired Planet further agreed that it "will not seek to make an affirmative showing that it received at least $25 million allocated or allocable solely for a license to the Openwave Licensed Patents under the terms of, or as a result of entering, the Lenovo Agreement." (*Id.* at ¶ 7)

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 475, 586 n. 10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by citing to "particular parts

of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

8

(stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV. DISCUSSION

The sole issue in this case is whether the Lenovo Agreement meets the requirements of the Qualifying Agreement provision. If it does, Microsoft has breached the License Agreement by refusing to pay the $10 million fee to Unwired Planet. Because the License Agreement provides that this dispute is governed by Delaware law (D.I. 101, ex. 1 § 11), the court must determine the meaning of "Qualifying Agreement" according to Delaware's principles of contract interpretation.

Under Delaware law, "the threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous." *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007). "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party." *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005). An ambiguity exists only when a contract is fairly susceptible to two or more reasonable interpretations. *Rossi v. Ricks*, 2008 WL 3021033, at *2 (Del. Ch. Aug. 1, 2008). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1996). "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create

9

ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

Both parties assert that the Qualifying Agreement provision is unambiguous. (D.I. 95 at 17; D.I. 104 at 17) The court recognizes that, under Delaware law, the determination of whether an ambiguity exists "lies within the sole province of the court." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010). The court finds no reason to disagree with the parties' assertions that the Qualifying Agreement provision is unambiguous.

To reiterate, Section 5.1.3 reads, in pertinent part:

> [A] "Qualifying Agreement" means a non-exclusive and non-sublicensable patent license with an unaffiliated operating company **under the Openwave Licensed Patents** (i) that is executed within three (3) years of the Effective Date, and (ii) **for which** Openwave receives a payment of at least Twenty-Five Million US dollars ($25,000,000.00 US).

(D.I. 101, Ex. 1 § 5.1.3) The highlighted words embody the entirety of the parties' dispute. Microsoft essentially argues that "under the Openwave Licensed Patents" means "solely for the Openwave Licensed Patents." If the word "under" does not denote an exclusivity requirement, then summary judgment must be awarded in favor of Unwired Planet.

The word "under" has many definitions and "must draw its meaning from its context." *Ardestani v. I.N.S.*, 502 U.S. 129, 135 (1991). There appears to be no Delaware case that construes the term, but several cases from the U.S. Supreme Court have found that "under" means "subject to," "in accordance with," or "in compliance with." *See Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1359 (2013) (finding that "under" means "in accordance with," "in compliance with," or "subject to"); *Ardestani*, 502 U.S. at 135 (stating that "under" means "subject to" or "governed by"); *Mala Geoscience AB v. Witten Techs., Inc.*, 2007 WL 1576318, at *5 (D.D.C. May 30, 2007) (concluding that

10

"under" means "pursuant to, in accordance with, or as authorized or provided by" (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 659 (1999)).

Delaware courts will also "look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006). The dictionary definitions of "under" are consistent with the case law. *See* The Random House Dictionary of the English Language 2059 (2d ed. 1987) (defining "under" as "subject to the authority, direction, or supervision of" or "in accordance with"); Webster's Third New Int'l Dictionary 2487 (1966) (defining "under" to mean "in accordance with" or "bound by"); Oxford English Dictionary, http:// www.oed.com/view/Entry/211395 (accessed May 26, 2016) (meaning "subject to," "bound or constrained (legally or morally) by," or "in accordance with").

Ultimately, despite the versatility with which the term "under" can be employed, there appears to be no case or dictionary supporting the argument that the word denotes exclusivity. Thus, the court cannot find that the Lenovo Agreement is not "under the Openwave Licensed Patents." The Lenovo Agreement granted Lenovo a license "under the Licensed Patents." (D.I. 101, Ex. 9 § 2.1) The term "Licensed Patents" is defined as "all patents and patent applications that are owned or controlled by Unwired Planet." (*Id.* § 1.6) At the time that the Lenovo Agreement was executed, the Openwave Licensed Patents were owned by Unwired Planet. Accordingly, the Lenovo Agreement grants a license to Lenovo that is "subject to," "in accordance with," or "in compliance with" the Openwave Licensed Patents.

If Microsoft intended to limit the scope of the patents granted by a Qualifying Agreement, it could have stated that by including words such as "solely under," "only

11

under" or "exclusively under." Microsoft did not limit the scope of the patents although it clearly knew how. For example, in Section 1.7 of the License Agreement, Microsoft made clear that the patents it was licensing to Unwired Planet included "[f]or the avoidance of doubt, **only** the fifteen patents identified by Openwave and added to this Agreement as Exhibit B...." (D.I. 101, Ex. 1 § 1.7) (emphasis added) The negotiating history demonstrates other language Microsoft could have used to denote an exclusivity or attribution requirement. But neither that language nor language similar to the examples provided above appear in the final agreement.[2]

Under Delaware law, "[p]arties have a right to enter into good and bad contracts, the law enforces both." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010). The court cannot "rewrite the contract or appease a party who later wants to escape from what it now considers to be a bad deal." *N.K.S. Distributors, Inc. v. Tigani*, 2010 WL 2178520, at *7 (Del. Ch. May 28, 2010). Ultimately, the plain meaning of "under" does not support Microsoft's interpretation and, indeed, Microsoft has conceded that a license including the Openwave Licensed Patents, as well as other patents, qualifies as a license "under the Openwave Patents." (D.I. 100 at 28; D.I. 109 at 4; D.I. 115 at 42-43) Microsoft contends, however, that this is insufficient to satisfy Section 5.1.3 because Unwired Planet must be paid at least $25 million solely for the Openwave Licensed Patents. (D.I. 109 at 4)

---

[2]     Microsoft claims that its proposed exclusivity and attribution language was an unnecessary form of "belt and suspenders." (D.I. 100 at 10) But Section 5.1.3 itself demonstrates that Microsoft was not above negotiating for the inclusion of belt and suspenders language. That section includes an "avoidance of doubt" provision stating the seemingly obvious concept that Microsoft would not have to pay the $10 million fee if Unwired Planet did not actually close a Qualifying Agreement. (D.I. 101, Ex. 9 § 5.1.3)

According to Microsoft, the phrase "for which Openwave receives ... at least Twenty-Five Million US dollars" refers to a "license ... under the Openwave Licensed Patents." (D.I. 100 at 18) Microsoft asserts that the subject "license" includes the words "under the Openwave Licensed Patents" and, therefore, Unwired Planet must receive at least $25 million solely for the Openwave Licensed Patents. (*Id.*) Assuming Microsoft is correct that the subject "license" must include the phrase "under the Openwave Licensed Patents," which seems dubious, it does not help Microsoft's argument.

As a general rule of construction, Delaware law gives the same word or phrase the same meaning throughout the contract absent countervailing reasons. *In re Mobilactive Media, LLC*, 2013 WL 297950, at *19 (Del. Ch. Jan. 25, 2013). The court finds no reason to deviate from this rule, particularly where it is the same word in the same place being read in conjunction with different clauses. It would be inconsistent to find that "under the Openwave Licensed Patents" denotes exclusivity with respect to the $25 million payment for a license when the court has found (and Microsoft concedes) that "under" does not denote exclusivity with respect to the patents included in the scope of the license.[3] Accordingly, it is sufficient that Unwired Planet received at least $25 million for a license that is "subject to," "in accordance with," or "in compliance with" the Openwave Licensed Patents. The Lenovo Agreement satisfies that criteria.

---

[3]     Microsoft argues that such a construction impermissibly results in two different meanings being attributed to the word "license" (D.I. 100 at 25), that is, the word "license" would mean both the right to use the Openwave Licensed Patents as well as the agreement itself. (*Id.*) But that is exactly how the word "license" is defined. *See* Black's Law Dictionary (10th ed. 2014) (defining license as "[a] permission, usually revocable, to commit some act that would otherwise be unlawful" or the "document evidencing such permission").

Finally, the purported market validation purpose behind the Qualifying Agreement provision does not change the outcome of this decision. First, "case law and contract law are clear that the subjective intent of a party is not controlling." *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *16 (Del. Ch. Oct. 30, 2015). "What matters is what a reasonable person reading the contract objectively would think it means." *Id.* Second, it is doubtful that the Qualifying Agreement provision was actually intended to operate as market validation, because Microsoft provided consideration worth more than $25 million to license the Openwave Licensed Patents. The License Agreement was in fact a cross-license. (D.I. 104 at 16) Thus, the total consideration paid by Microsoft for the Openwave Licensed Patents included both a cash consideration of $25 million and the value of the license for the Microsoft patents.[4] (*Id.*) The fact that there is no equivalency between the total consideration paid by Microsoft and the $25 million required by the Qualifying Agreement provision undermines any assertion that the purpose of the provision was market validation.

## V. CONCLUSION

For the foregoing reasons, Unwired Planet's motion for summary judgment (D.I. 94) is granted, and Microsoft's motion for summary judgment (D.I. 93) is denied. An appropriate order shall issue.

---

[4]    Unwired Planet did not pay any cash consideration for the license of the Microsoft patents, and Microsoft confirmed that the license of those patents is worth more than zero. (D.I. 104 at 16-17)

14